9 So.3d 1 (2008)
The STATE of Florida, Appellant,
v.
Joelis JARDINES, Appellee.
No. 3D07-1615.
District Court of Appeal of Florida, Third District.
October 22, 2008.
*2 Bill McCollum, Attorney General, and Rolando A. Soler, Assistant Attorney General, for appellant.
Bennett H. Brummer, Public Defender, and Howard K. Blumberg, Assistant Public Defender, and Jorge Rodriguez and Mariam Deghani, Certified Legal Interns, for appellee.
Before COPE, WELLS, and SALTER, JJ.
WELLS, Judge.
The State of Florida appeals from an order suppressing evidence seized pursuant to a search warrant executed on the home of Joelis Jardines. We reverse because the trial court erred in ruling that the magistrate lacked probable cause to issue the warrant and because the evidence suppressed was admissible under the "inevitable discovery" doctrine.
On December 5, 2006, William Pedraja, an officer with the Miami-Dade Police Department, obtained a search warrant from Miami-Dade County Court Judge George Sarduy. The warrant was supported by a probable cause affidavit which identified the premises to be searched, detailed Officer Pedraja's extensive experience in detecting hydroponic marijuana laboratories *3 and the methods and equipment used in such laboratories, and stated:
"Your Affiant's" reasons for the belief that "The Premises" is being used as [a marijuana hydroponics grow lab] and that "The Property [consisting of marijuana and the equipment to grow it]" listed above is being concealed and stored at "The Premises" is as follows:
On November 3, 2006, "Your Affiant" detective William Pedraja, # 1268, received information from a crime stoppers tip that marijuana was being grown at the described residence.
On December 5, 2006, "Your Affiant" conducted surveillance at the residence and observed no vehicles in the driveway. "Your Affiant" also observed windows with the blinds closed. "Your Affiant" and Detective Doug Bartelt with K-9 drug detection dog "FRANKY" approached "The Premises" in an attempt to obtain a consent to search. While at front door [sic], "Your Affiant" detected the smell of live marijuana plants emanating from the front door of "The Premises." The scent of live marijuana is a unique and distinctive odor unlike any other odor. Additionally, K-9 drug detection dog "FRANKY" did alert to the odor of one of the controlled substances he is trained to detect. "Your Affiant," in an attempt to obtain a written consent to search, knocked on the front door of "The Premises" without response. "Your Affiant" also heard an air conditioning unit on the west side of the residence continuously running without recycling. The combination of these factors is indicative of marijuana cultivation.
Based upon the positive alert by narcotics detector dog "FRANKY" to the odor of one or more of the controlled substances that she is trained to detect and "FRANKY" [sic] substantial training, certification and past reliability in the field in detecting those controlled substances, it is reasonable to believe that one or more of those controlled substances are present within the area alerted to by "FRANKY." Narcotics Canine handler, Detective Bartelt, Badge number 4444, has been a police officer with the Miami-Dade Police Department for nine years. He has been assigned to the Narcotics Bureau for six years and has been a canine handler since May 2004. In the period of time he has been with the Department, he has participated in over six hundred controlled substances searches. He has attended the following training and received certification as a canine handler....
Since becoming a team, Detective Bartelt and narcotics detector canine "FRANKY" have received weekly maintenance training.... Narcotics detector canine "FRANKY" is trained to detect the odor of narcotics emanating from the following controlled substances to wit: marijuana.... To date, narcotics detector canine "FRANKY" has worked approximately 656 narcotics detection tasks in the field. He has positively alerted to the odor of narcotics approximately 399 times. "FRANKY'S" positive alerts have resulted in the detection and seizure of approximately 13,008 grams of cocaine, 2,638 grams of heroin, 180 grams of methamphetamine, 936,614 grams of marijuana, both processed ready for sale and/or live growing marijuana.
WHEREFORE, Affiant prays that a Search Warrant be issued ... to search "The Premises" above-described....
(Emphasis added).
A search conducted pursuant to the warrant resulted in seizure of live marijuana *4 plants and the equipment used to grow them, and resulted in Jardines being charged with trafficking in cannabis and theft for stealing the electricity needed to grow it.
Jardines, relying primarily on State v. Rabb, 920 So.2d 1175 (Fla. 4th DCA 2006), moved to suppress[1] arguing that no probable cause existed to support the warrant because: (1) the dog "sniff" constituted an illegal search; (2) Officer Pedraja's "sniff" was impermissibly tainted by the dog's prior "sniff"; and (3) the remainder of the facts detailed in the affidavit were legally insufficient to give rise to probable cause.
We reverse the trial court's determination that "the use of a drug detector dog at the Defendant's house door constituted an unreasonable and illegal search" and that the evidence seized at Jardines' home must be suppressed. We do so because, first, a canine sniff is not a Fourth Amendment search; second, the officer and the dog were lawfully present at the defendant's front door; and third, the evidence seized would inevitably have been discovered.

A Canine Sniff Is Not A Fourth Amendment Search
In Illinois v. Caballes, 543 U.S. 405, 408, 125 S.Ct. 834, 160 L.Ed.2d 842 (2005), the United States Supreme Court expressly rejected the notion that a "dog sniff itself infringed [a] ... constitutionally protected interest in privacy." In doing so, the Court confirmed that because a dog sniff detects only contraband, and because no one has a "legitimate" privacy interest in contraband, a dog sniff is not a search under the Fourth Amendment.
Official conduct that does not "compromise any legitimate interest in privacy" is not a search subject to the Fourth Amendment. [United States v. Jacobsen, 466 U.S. 109, 123, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984)]. We have held that any interest in possessing contraband cannot be deemed "legitimate," and thus, governmental conduct that only reveals the possession of contraband "compromises no legitimate privacy interest." Ibid. This is because the expectation "that certain facts will not come to the attention of the authorities" is not the same as an interest in "privacy that society is prepared to consider reasonable." Id., at 122, 104 S.Ct. 1652 (punctuation omitted). In United States v. Place, 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983), we treated a canine sniff by a well-trained narcotics-detection dog as "sui generis" because it "discloses only the presence or absence of narcotics, a contraband item." Id., at 707, 103 S.Ct. 2637; see also Indianapolis v. Edmond, 531 U.S. 32, 40, 121 S.Ct. 447, 148 L.Ed.2d 333 (2000). Respondent likewise concedes that "drug sniffs are designed, and if properly conducted are generally likely, to reveal only the presence of contraband."
Caballes, 543 U.S. at 408-9, 125 S.Ct. 834 (some citations omitted).
Based on this reasoning, we reject the notion that Kyllo v. United States, 533 U.S. 27, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001), relied on in Rabb, makes a dog's detection of contraband while standing on a front porch open to the public, a search which compromises a legitimate privacy *5 interest. Kyllo involved the use of a mechanical device which detected heat radiating from the walls of a home. There, the Court was concerned with the use of constantly improving technological devices that, from outside a home, could intrude into the home and detect legitimate as well as illegal activity going on inside. Kyllo, 533 U.S. at 40, 121 S.Ct. 2038 ("Where, as here, the Government uses a device that is not in general public use, to explore details of the home that would previously have been unknowable without physical intrusion, the surveillance is a `search' and presumptively unreasonable without a warrant.").
A dog's nose is not, however, a "device," nor is it improved by technology. Dogs have been used to detect scents for centuries all without modification or "improvement" to their noses. That, perhaps, is why the Supreme Court describes them as "sui generis," in Place. Place, 462 U.S. at 707, 103 S.Ct. 2637. Moreover, and unlike the thermal imaging device at issue in Kyllo, a dog is trained to detect only illegal activity or contraband. It does not indiscriminately detect legal activity.
These differences prompted the Court in Caballes to note that its conclusion that the dog sniff involved there was lawful was consistent with its earlier decision in Kyllo:

This conclusion is entirely consistent with our recent decision that the use of a thermal-imaging device to detect growth of marijuana in a home constituted an unlawful search Kyllo v. United States, 533 U.S. 27, 121 S.Ct. 2083 [2038], 150 L.Ed.2d 94 (2001). Critical to that decision was the fact that the device was capable of detecting lawful activity-in that case, intimate details in a home, such as "at what hour each night the lady of the house takes her daily sauna and bath." Id., at 38, 121 S.Ct. 2038. The legitimate expectation that information about perfectly lawful activity will remain private is categorically distinguishable from respondent's hopes or expectations concerning the nondetection of contraband in the trunk of his car. A dog sniff conducted during a concededly lawful traffic stop that reveals no information other than the location of a substance that no individual has any right to possess does not violate the Fourth Amendment.
Caballes, 543 U.S. at 409-10, 125 S.Ct. 834.
As recently observed in People v. Jones, 279 Mich.App. 86, 755 N.W.2d 224, 228 (2008),[2] a majority of federal circuit courts have viewed the Place Court's holding as generally categorizing canine sniffs as nonsearches. See, e.g., United States v. Reed, 141 F.3d 644, 648 (6th Cir.1998); see also United States v. Brock, 417 F.3d 692 (7th Cir.2005); United States v. Roby, 122 F.3d 1120 (8th Cir.1997); United States v. Vasquez, 909 F.2d 235 (7th Cir.1990).[3] Likewise, *6 "the vast majority of state courts considering canine sniffs have recognized that a canine sniff is not a Fourth Amendment search."[4]People v. Jones, 755 N.W.2d at 228.
Thus, as the Fifth District concluded in Nelson v. State, 867 So.2d 534, 537 (Fla. 5th DCA 2004):
The fact that the dog, as odor detector, is more skilled than a human does not render the dog's sniff illegal. See United States v. Sullivan, 625 F.2d 9, 13 (4th Cir.1980). Just as evidence in the plain view of officers may be searched without a warrant, see Harris v. United States, 390 U.S. 234, 236, 88 S.Ct. 992, 993, 19 L.Ed.2d 1067 (1968), evidence in the plain smell may be detected without a warrant. See United States v. Harvey, 961 F.2d 1361, 1363 (8th Cir.1992); See also Horton v. Goose Creek Independent School District, 690 F.2d 470, 477 (5th Cir.1982); United States v. Pinson, 24 F.3d 1056, 1058 (8th Cir.1994) ("plain feel," no reasonable expectation of privacy in heat emanating from a home).
See Cardwell v. State, 482 So.2d 512, 514 (Fla. 1st DCA 1986) ("Just as no police officer need close his eyes to contraband in plain view, no police officer armed with a sniff dog need ignore the olfactory essence of illegality.").[5]
In sum, "persuasive authority convinces us that a canine sniff is not a search within the meaning of the Fourth Amendment as long as the sniffing canine is legally present at its vantage point when its sense is aroused." People v. Jones, 755 N.W.2d at 228.

The Officer And The Dog Were Lawfully Present At The Defendant's Front Door
The Fourth Amendment to the United States Constitution clearly protects "the right of the people to be secure in *7 their persons, houses, papers, and effects," from "unreasonable government intrusions into their legitimate expectations of privacy." Place, 462 U.S. at 706, 103 S.Ct. 2637 (quoting United States v. Chadwick, 433 U.S. 1, 7, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977)). However "[t]he Fourth Amendment does not necessarily protect areas of a home which are `open and exposed to public view.'" State v. Duhart, 810 So.2d 972, 973 (Fla. 4th DCA 2002).
While this right to, and expectation of, privacy, no doubt, extends to the contents of a home, we need not resolve the extent to which this constitutional protection extends to every entryway in every possible factual scenario. Rather, at issue is this officer's presence at this defendant's front door. Here, police received a tip as to criminal activity and observed other indications of criminal activity. In such circumstances, the officer had every right to walk to the defendant's front door, as a number of Florida cases confirm.
In State v. Morsman, 394 So.2d 408, 409 (Fla.1981), the Florida Supreme Court concluded that a police officer had the right to approach a front door after being told by a neighbor that Morsman was growing marijuana plants in his backyard:
When the officer went to respondent's front door to investigate the neighborhood complaint, he was not infringing upon respondent's privacy. Under Florida law it is clear that one does not harbor an expectation of privacy on a front porch where salesmen or visitors may appear at any time. State v. Detlefson, 335 So.2d 371 (Fla. 1st DCA 1976); State v. Belcher, 317 So.2d 842 (Fla. 2d DCA 1975).
Our decision that this officer was lawfully present at defendant's door is likewise consistent with Potts v. Johnson, 654 So.2d 596, 597-98 (Fla. 3d DCA 1995). Potts was a police detective investigating a theft and had been given a suspect's name. At the suspect's home, Potts stepped into a hole, was injured, and sued. Discussing Potts' right to be on the property, we observed:
A police officer in the scope of his duties may approach a suspect's front door and knock in an attempt to talk to that suspect. See United States v. Santana, 427 U.S. 38, 96 S.Ct. 2406, 49 L.Ed.2d 300 (1976); Younger v. State, 433 So.2d 636 (Fla. 5th DCA), rev. denied, 440 So.2d 354 (Fla.1983). "Under Florida law it is clear that one does not harbor an expectation of privacy on a front porch where a salesman or visitor may appear at any time." State v. Morsman, 394 So.2d 408, 409 (Fla.1981).
Potts, 654 So.2d at 598.
We also noted:
The "Plain View" doctrine has frequently been considered an exception to the warrant requirement. In reality, materials that are seized because they are in plain view of an officer who observes from a location where he has a legal right to be are not subject to [a] Fourth Amendment [analysis] ...
Potts, 654 So.2d at 599 n. 5 (quoting Hornblower v. State, 351 So.2d 716, 718 n. 1 (Fla.1977)).
Also supporting our conclusion is State v. Pereira, 967 So.2d 312, 313 (Fla. 3d DCA 2007). In Pereira, officers went to the defendant's home based on an anonymous tip that the defendant was growing marijuana. A detective walked toward the premises and, while standing in front of the premises, smelled marijuana. Officers returned the next day with a narcotics-search dog. Approaching the front door, the officer again smelled the marijuana, and the canine alerted.
While we chose not to address the legality of the dog sniff, we rested our decision *8 on the officer's right to be on the defendant's front porch:
We disagree with the defendant's contention that the officers' detection of the odor of marijuana emanating from the defendant's home while standing on the sidewalk and front porch of the defendant's home is an invasion of the defendant's privacy protected by the Fourth Amendment. Admittedly, there was no evidence that the front yard or porch was enclosed by a fence or any other structure and was, in fact, open to public access. We follow those cases which hold that there is no reasonable expectation of privacy at the entrance to property which is open to the public, including the front porch. See State v. Morsman, 394 So.2d 408 (Fla.1981); State v. E.D.R., 959 So.2d 1225 (Fla. 5th DCA 2007), and cases cited; Ramize v. State, 954 So.2d 754 (Fla. 3d DCA 2007); Potts v. Johnson, 654 So.2d 596 (Fla. 3d DCA 1995); see, e.g., United States v. Cota-Lopez, 104 Fed.Appx. 931 (5th Cir.2004). Compare State v. Rabb, 920 So.2d at 1191.
Pereira, 967 So.2d at 314 (footnote omitted); State v. E.D.R., 959 So.2d 1225, 1226 (Fla. 5th DCA 2007) (concluding that defendant's porch "was not a constitutionally protected area"); see also State v. Garcia, 374 So.2d 601, 602-03 (Fla. 3d DCA 1979) (concluding "[w]hen the lawful performance of his duty requires that an officer enter upon private property to make a general inquiry, such an entry is justifiable," and holding that officers smelling "the odor of marijuana smoke" at the front door of a residence was a factor supporting a finding of probable cause).
From these cases, it is clear that Officer Pedraja had a right to approach Jardines' front door. The fact that he waited for the dog and approached with the dog does not change this result, even if the dog alerted before the officer detected the scent. The officer's presence with the dog and their sniff of the odor of marijuana as well as the other facts identified in the probable cause affidavit was sufficient to establish probable cause for the warrant to issue.[6] The trial court erred in concluding that the magistrate lacked probable cause to issue the warrant and erred in suppressing the evidence obtained as a result of the warrant.

Inevitable Discovery
Even if the dog sniff constituted an illegal search, the evidence seized at Jardines' home would still be admissible under the inevitable discovery rule. In Fitzpatrick v. State, 900 So.2d 495, 514 (Fla. 2005), our Supreme Court explained that illegally seized evidence may still be admitted into evidence if that evidence inevitably would have been discovered by legal means:
In Nix v. Williams, 467 U.S. 431, 448, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984), the United States Supreme Court adopted the "inevitable discovery" exception to the "fruit of the poisonous tree" doctrine. Under this exception, "evidence obtained as the result of unconstitutional police procedure may still be admissible provided the evidence would ultimately have been discovered by legal means." Maulden v. State, 617 So.2d 298, 301 (Fla.1993). In adopting the inevitable discovery doctrine, the Supreme Court explained, "Exclusion of *9 physical evidence that would inevitably have been discovered adds nothing to either the integrity or fairness of a criminal trial." Nix, 467 U.S. at 446, 104 S.Ct. 2501. In making a case for inevitable discovery, the State must demonstrate "that at the time of the constitutional violation an investigation was already under way." Moody v. State, 842 So.2d 754, 759 (Fla.2003) (quoting Nix v. Williams, 467 U.S. 431, 457, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984) (Stevens, J., concurring in the judgment)); see also Jeffries v. State, 797 So.2d 573, 578 (Fla.2001); Maulden, 617 So.2d at 301. In other words, the case must be in such a posture that the facts already in the possession of the police would have led to this evidence notwithstanding the police misconduct. See Moody, 842 So.2d at 759.
See Moody, 842 So.2d at 759 (confirming that "fruit of the poisonous tree" doctrine does not automatically render all illegally seized evidence inadmissible and that such evidence may be admitted if the State can show that the evidence inevitably would have been discovered in the course of a legitimate investigation); Rosales v. State, 878 So.2d 497, 500 (Fla. 3d DCA 2004) ("Evidence which was originally obtained improperly should not be suppressed, provided that it would have been legitimately uncovered pursuant to normal police practices."); State v. Ruiz, 502 So.2d 87, 87 (Fla. 4th DCA 1987) (finding that "to apply this doctrine, there does not have to be an absolute certainty of discovery, but rather, just a reasonable probability" (citing United States v. Brookins, 614 F.2d 1037 (5th Cir.1980))); see also Jeffries, 797 So.2d at 578 (quoting Ruiz).
Both the affidavit and the evidence adduced below confirm that an investigation was already well under way, and Officer Pedraja had already decided to knock on Jardines' front door to see if he could obtain consent to search, by the time the dog got involved. Thus, even in the absence of the canine sniff, Officer Pedraja would, pursuant to normal police practices, have detected the scent of marijuana as he approached Jardines' door. See Potts, 654 So.2d at 599 (confirming that a "police officer in the scope of his duties may approach a suspect's front door and knock in an attempt to talk to that suspect"). With or without the canine alert, the contraband would inevitably have been detected. On this basis alone, the motion to suppress should have been denied. See Rabb, 920 So.2d at 1196 n. 8 (Gross, J., dissenting); see generally Zeigler v. State, 922 So.2d 384, 385 (Fla. 1st DCA 2006) ("Under the inevitable discovery rule, when evidence is obtained through the result of unconstitutional police procedures, the evidence will still be admissible if it would have been discovered through legal means."). See Jeffries, 797 So.2d at 577-78 ("Here, the trial court determined that Officer Brownfield smelled marijuana when he went to Appellants' stopped vehicle. Had Officer Brownfield immediately explained the reason for the stop when he made personal contact with Appellants, rather than first asking Appellants for their identification, he would have still smelled marijuana and thus developed probable cause to detain Appellants."); Jones v. State, 758 So.2d 722, 722 (Fla. 3d DCA 2000) (citing Maulden, 617 So.2d at 298, for the proposition that "under `inevitable discovery' doctrine, evidence obtained as the result of an unlawful search is admissible if the evidence would ultimately have been discovered by legal means"); A.J.M. v. State, 746 So.2d 1222, 1225 (Fla. 3d DCA 1999) ("Florida has adopted the inevitable discovery doctrine which provides that `evidence obtained as the result of unconstitutional police procedure may still be admissible provided the *10 evidence would ultimately have been discovered by legal means.'" (quoting Maulden, 617 So.2d at 298)).

Conclusion
In sum, we reverse the order suppressing the evidence at issue. We conclude that no illegal search occurred. The officer had the right to go up to defendant's front door. Contrary to the holding in Rabb, a warrant was not necessary for the drug dog sniff, and the officer's sniff at the exterior door of defendant's home should not have been viewed as "fruit of the poisonous tree." The trial judge should have concluded substantial evidence supported the magistrate's determination that probable cause existed.[7] Moreover, the evidence at issue should not have been suppressed because its discovery was inevitable. To the extent our analysis conflicts with Rabb, we certify direct conflict. To the extent that Judge Gross' dissent in Rabb is consistent with this analysis we adopt his reasoning as our own. See Rabb, 920 So.2d at 1196 (Gross, J., dissenting). Reversed and remanded.
SALTER, J., concurs.
COPE, J. (concurring in part and dissenting in part).
The question before us is whether, and to what extent, the Fourth Amendment is applicable when the police seek to use a drug-sniffing dog at the front door of a private home. I agree with that part of the majority opinion which holds that a warrant is not necessary for a drug-dog sniff, and agree on certifying direct conflict with the Fourth District decision in State v. Rabb, 920 So.2d 1175 (Fla. 4th DCA 2006).
I do not agree with the majority opinion's "sniff anytime" rule. We should instead follow those courts which hold that a drug sniff is permissible at the door of a dwelling only if there is a reasonable suspicion of drug activity.

I.
The Miami-Dade County Police Department received a Crime Stoppers tip that marijuana was being grown at the home of defendant-appellee Joelis Jardines. One month later the detective went to the home at 7 a.m. He watched the home for fifteen minutes. There were no vehicles in the driveway, the blinds were closed, and there was no observable activity.
After fifteen minutes, the dog handler arrived with the drug detection dog. The handler placed the dog on a leash and accompanied the dog up to the front door of the home. The dog alerted to the scent of contraband.
The handler told the detective that the dog had a positive alert for the odor of narcotics. The detective went up to the front door for the first time, and smelled marijuana. The detective also observed that the air conditioning unit had been running constantly for fifteen minutes or so, without ever switching off.[8]
The detective prepared an affidavit and applied for a search warrant, which was issued. A search was conducted, which *11 confirmed that marijuana was being grown inside the home. The defendant was arrested.
The defendant moved to suppress the evidence seized at his home. The trial court conducted an evidentiary hearing at which the detective and the dog handler testified. The trial court suppressed the evidence on authority of State v. Rabb. The State has appealed.

II.
The Fourth Amendment protects "[t]he right of the people to be secure in their... houses ... against unreasonable searches and seizures...." U.S. Const. amend. IV; Art. I, § 12, Fla. Const.
The majority opinion takes the position that constitutional protection extends only to the interior of a home, and not the front porch. However, the cases the majority relies on do not apply in the present context.
While the United States Supreme Court has "decoupled violation of a person's Fourth Amendment rights from trespassory violation of his property," Kyllo v. United States, 533 U.S. 27, 32, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001), the law of trespass is useful by way of analogy. In an ordinary residential neighborhood, a typical home has walkway (or possibly driveway) access leading to the front porch. Although the walkway, driveway, and porch are part of the homeowner's private property, the owner "by implication, invites others to come to his house as they may have proper occasion, either of business, or courtesy, for information, etc. Custom must determine in these cases what the limit is of the implied invitation." Prior v. White, 132 Fla. 1, 180 So. 347, 355 (1938) (italics and internal quotation marks omitted). The homeowner may expect a knock at the door from a seller of goods, a solicitor of charitable contributions, or a neighbor on a social call. The postal service will deliver the mail and a delivery truck may drop off a package.
On the other hand, there is no such thing as squatter's rights on a front porch. A stranger may not plop down uninvited to spend the afternoon in the front porch rocking chair, or throw down a sleeping bag to spend the night, or lurk on the front porch, looking in the windows. The vendor who may hawk his goods during daylight hours is not welcome to knock at the door at two o'clock in the morning.
Turning to crime investigation, it is perfectly acceptable for a detective to come to the front door to speak with the owner. Where the officer has come to the front door to speak to the owner, there is no expectation of privacy regarding any incriminating objects the owner has left in plain view, or in any odors (such as marijuana) that may be emanating from the dwelling. The cases relied on by the majority opinion fall into this fact pattern. See State v. Morsman, 394 So.2d 408, 408-09 (Fla.1981) (permissible for officer to go to front door to investigate complaint); State v. Pereira, 967 So.2d 312, 314 (Fla. 3d DCA 2007) (officer walked from sidewalk to the home and smelled marijuana); State v. E.D.R., 959 So.2d 1225, 1226 (Fla. 5th DCA 2007) (officer walked up walkway to determine why several young men were asleep on front porch and observed crack cocaine on E.D.R.'s lap); Potts v. Johnson, 654 So.2d 596, 599 (Fla. 3d DCA 1995) (permissible for officer to go to front door to investigate theft); see also Ramize v. State, 954 So.2d 754 (Fla. 3d DCA 2007) (no facts given; cites Morsman and Potts).
But here, too, there are limits. A crime scene investigation unit cannot (absent consent or a warrant) cordon off the front porch and begin dusting the porch for *12 fingerprints, or conduct a microscopic examination for blood stains, or deploy a magnetometer or sonar to determine what lies beneath the porch.
In short, it is inaccurate to say that there is never any reasonable expectation of privacy with regard to the front porch of a house, although it is a more reduced expectation than applies to the house interior.

III.
A number of courts have considered the question how the Fourth Amendment applies in the context of a dog sniff at the door of a house or apartment. Three schools of thought have emerged: (1) A dog sniff of a dwelling is a search which can only be conducted pursuant to a warrant. United States v. Thomas, 757 F.2d 1359, 1366-67 (2d Cir.1985); Rabb, 920 So.2d at 1186-87. (2) A dog sniff can only be conducted where there is a reasonable, articulable suspicion of drug activity inside the residence, but no warrant is required. State v. Ortiz, 257 Neb. 784, 600 N.W.2d 805, 820 (1999).(3) A dog sniff is not a search and can be conducted without a warrant and without a reasonable suspicion. People v. Jones, 279 Mich.App. 86, 755 N.W.2d 224 (2008). See generally Brian L. Porto, Annotation, Use of Trained Dog to Detect Narcotics or Drugs as Unreasonable Search in Violation of Fourth Amendment, 150 A.L.R. Fed. 399 (1998); Lewis R. Katz & Aaron P. Golemboewski, Curbing the Dog: Extending the Protection of the Fourth Amendment to Police Drug Dogs, 85 Neb. L. Rev. 735 (2007); 1 Wayne R. LaFave, Search and Seizure, § 2.2(g) (4th ed. 2004).
Turning to the first alternative  a dog sniff at the front door is a search requiring a warrant  the Second Circuit has explained, "It is one thing to say that a sniff in an airport is not a search, but quite another to say that a sniff can never be a search. The question always to be asked is whether the use of a trained dog intrudes on a legitimate expectation of privacy." Thomas, 757 F.2d at 1366 (citing Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967)). The courts "have recognized the heightened privacy interest that an individual has in his dwelling place." Thomas, 757 F.2d at 1366; Kyllo, 533 U.S. at 34, 121 S.Ct. 2038. "Thus, a practice that is not intrusive in a public airport may be intrusive when employed at a person's home." Thomas, 757 F.2d at 1366. Because of the defendant's "heightened expectation of privacy inside his dwelling, the canine sniff at his door constituted a search," id. at 1367, for which a warrant was required. The Fourth District reached the same conclusion in Rabb, 920 So.2d at 1187.[9]
The second school of thought is that a dog sniff does not require a search warrant, but should instead be allowed on the showing of a reasonable suspicion. The Nebraska Supreme Court explained:
We agree with the courts which conclude an individual's Fourth Amendment privacy interests may extend in a limited manner beyond the four walls of the home, depending on the facts, including *13 some expectation of privacy to be free from police canine sniffs for illegal drugs in the hallway outside an apartment or at the threshold of a residence, and that a canine sniff under these circumstances must be based on no less than reasonable, articulable suspicion.
Ortiz, 600 N.W.2d at 817 (Neb.1999).
The Court ruled:
We believe that there is a Fourth Amendment middle ground applicable to the investigations conducted by police handlers of narcotics detection dogs. On the one hand, much of the law enforcement utility of such dogs would be lost if full blown warrant procedures were required before a canine sniff could be used; but on the other, it is our view that a free society will not remain free if police may use this, or any other crime detection device, at random and without reason. Accordingly, we hold that a narcotics detection dog may be deployed to test for the presence of narcotics ... where:
(1) the police are able to articulate reasonable grounds for believing that drugs may be present in the place they seek to test; and
(2) the police are lawfully present in the place where the canine sniff is conducted.
Id. at 816 (quoting Commonwealth v. Johnston, 515 Pa. 454, 530 A.2d 74, 79 (1987)).
The third school of thought is that a dog sniff is not a search, and there is no reasonable expectation of privacy on a front porch, so that a dog sniff can be conducted at the front door, without a warrant and without having a reasonable suspicion. The majority opinion adopts that position.
A number of courts have expressed concern about the breadth of such a rule. The Fourth District expressed disapproval of the prospect that a drug-sniffing dog could be brought at random to the front door "of every house on a street hoping the dog sniffs drugs inside." Rabb, 920 So.2d at 1190. The Nebraska Supreme Court and New York Court of Appeals likewise disapprove the prospect that such a rule would allow drug-sniffing dogs to be brought at random through the corridors of public housing projects. Ortiz, 600 N.W.2d at 816 (quoting People v. Dunn, 77 N.Y.2d 19, 563 N.Y.S.2d 388, 564 N.E.2d 1054, 1058 (1990)). Those jurisdictions conclude that a rule must be crafted which reasonably balances law enforcement and privacy interests.
In my view the balance is best struck by the second option: a drug-dog sniff is permissible only if there is a reasonable suspicion that drugs may be present in the place the police seek to test. As Professor LaFave points out, "with rare exception the [reported] cases have involved situations in which the [dog] alert occurred after a pre-existing reasonable suspicion." 1 Wayne R. LaFave, supra, § 2.2(g), at 533-34 (footnotes omitted).
The State argues that the third option  sniff anytime  is correct and is mandated by the United States Supreme Court's decision in Caballes, 543 U.S. at 405, 125 S.Ct. 834, but that is not so. In Caballes, the defendant was stopped in a legal traffic stop. Although there was no reasonable suspicion of drug activity, the police brought a drug dog to the car, which alerted on the trunk. The Court upheld the search, saying, "A dog sniff conducted during a concededly lawful traffic stop that reveals no information other than the location of a substance that no individual has any right to possess does not violate Fourth Amendment." Id. at 410, 125 S.Ct. 834. The State argues that this logic is equally applicable, and dispositive, of a dog *14 sniff at a front door. The State's reliance on Caballes is misplaced.
In the first place, the Caballes Court was careful to tie its holding to the facts of the case: "the use of a well-trained narcotics-detection dog  one that `does not expose non-contraband items that otherwise would remain hidden from public view,'  during a lawful traffic stop, generally does not implicate legitimate privacy interests." Id. at 409, 125 S.Ct. 834 (citation omitted); see also id. at 417, 125 S.Ct. 834 (Souter, J., dissenting) ("The Court today does not go so far as to say explicitly that sniff searches by dogs trained to scent contraband always get a free pass under the Fourth Amendment, since it reserves judgment on the constitutional significance of sniffs assumed to be more intrusive than a dog's walk around a stopped car[.]").
Second, the unusual procedural history of the Fourth District's Rabb decision indicates that the Court has, for now, decided to leave the issue open. In 2004, the Fourth District issued its initial decision in State v. Rabb, 881 So.2d 587 (Fla. 4th DCA 2004), in which it held that a warrant is required for a dog sniff at the door of Rabb's house. Id. at 595-96. On the State's petition for writ of certiorari, the United States Supreme Court granted the petition, vacated the judgment, and remanded the matter to the Fourth District for further consideration in light of the Court's 2005 decision in Caballes. Florida v. Rabb, 544 U.S. 1028, 125 S.Ct. 2246, 161 L.Ed.2d 1051 (2005). On remand, the Fourth District issued a new and more detailed opinion, again deciding that a warrant was necessary for a dog sniff at the front door of the house. Rabb, 920 So.2d at 1188-92. Review was denied by the Florida Supreme Court, State v. Rabb, 933 So.2d 522 (Fla.2006), and certiorari was denied by the United States Supreme Court in Florida v. Rabb, 549 U.S. 1052, 127 S.Ct. 665, 166 L.Ed.2d 513 (2006). While the denial of certiorari by the United States Supreme Court has no precedential effect, it certainly indicates that the Court has decided to leave this dog sniff question open for decision another day.
For the stated reasons, we should adopt the middle alternative, which is to allow a drug-dog sniff at a front door if there is a reasonable suspicion of drug activity. When this case was pending in the trial court, the debate was about whether the warrant requirement of Rabb should be followed, and there was no consideration of a reasonable suspicion standard. We should therefore remand the case to the trial court to consider whether there was a reasonable suspicion which supported the dog sniff in this case.

IV.
The majority opinion contains an alternative analysis for reversal which is based on the inevitable discovery rule of Nix v. Williams, 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984), and Fitzpatrick v. State, 900 So.2d 495, 514 (Fla.2005). The majority opinion reasons that even if the dog sniff must be excluded from consideration, the detective came to the porch after the dog sniff and also smelled marijuana. The majority opinion concludes that the detective's own "sniff" is sufficient to supply probable cause for the issuance of the search warrant. I am unable to agree.
The problem here is that the dog handler went to the porch first, and informed the detective that the dog had a positive alert. It was with the knowledge of the positive alert that the detective then went to the front door and smelled marijuana. In light of this time sequence, the second identification is tainted by the first. That being so, I do not believe that we can reverse the trial court's ruling on the basis of the inevitable discovery rule. I agree *15 with the Rabb decision on this point. 920 So.2d at 1191.

V.
Although we are reversing the trial court order, it bears mention that the trial court should not be faulted for its ruling. That is so because under Florida Supreme Court precedent, the trial court had no realistic alternative other than to follow the Fourth District's decision in Rabb. The Florida Supreme Court has explained that when "the only case on point on a district [court of appeal] level is from a district other than the one in which the trial court is located, the trial court [is] required to follow that [other district's] decision." Pardo v. State, 596 So.2d 665, 666 (Fla. 1992) (quoting State v. Hayes, 333 So.2d 51 (Fla. 4th DCA 1976)). The only decision squarely addressing a dog sniff at the front door of a private home was Rabb, and the trial court correctly concluded that the court was bound to follow it.

VI.
For the stated reasons, I agree that a search warrant was not required for a dog sniff at the door of a dwelling, and concur in reversing the order now before us. I concur in certifying direct conflict with the Fourth District's decision in Rabb.
We should, however, adopt the rule that a reasonable suspicion is required before a drug-dog sniff is allowed at the front door of a dwelling. We should remand for a determination whether a reasonable suspicion existed.
NOTES
[1] Florida Rule of Criminal Procedure 3.190 provides in pertinent part:

(h) Motion to Suppress Evidence in Unlawful Search.
(1) Grounds. A defendant aggrieved by an unlawful search and seizure may move to suppress anything so obtained for use as evidence because:
....
(D) there was no probable cause for believing the existence of the grounds on which the warrant was issued.
[2] We commend the Public Defender for the 11th Judicial Circuit, and particularly, Howard K. Blumberg, Esq., for its and his professionalism in bringing this case  which undercuts their position here  to our attention.
[3] People v. Jones identifies United States v. Thomas, 757 F.2d 1359 (2d Cir.1985), as an exception to the "sniff is not a search" holdings. People v. Jones, 755 N.W.2d at 228. Thomas was relied on in Rabb which we decline to follow. Rabb, 920 So.2d at 1184; but see Nelson v. State, 867 So.2d 534, 536 (Fla. 5th DCA 2004) (observing "the very correctness of the Thomas decision is called into question by its assertion that the defendant `had a legitimate expectation that the contents of his closed apartment would remain private.' As was shown above, the Supreme Court's analyses in Place and Jacobsen indicate that a possessor of contraband can maintain no legitimate expectation that its presence will not be revealed. No legitimate expectation of privacy is impinged by governmental conduct that can `reveal nothing about noncontraband items.'" (quoting United States v. Colyer, 878 F.2d 469, 475 (D.C.Cir.1989))).
[4] As listed in People v. Jones, the following states, including Florida, have in various contexts concluded that a canine sniff is not a Fourth Amendment search:

State v. Box, 205 Ariz. 492, 496-497, 73 P.3d 623 (Ariz.App.2003); Sims v. State, 356 Ark. 507, 157 S.W.3d 530 (2004); People v. Ortega, 34 P.3d 986, 991 (Colo.2001); Bain v. State, 839 So.2d 739 (Fla.App. 2003); Cole v. State, 254 Ga.App. 424, 562 S.E.2d 720 (2002); State v. Parkinson, 135 Idaho 357, 17 P.3d 301 (Idaho App.2000); People v. Cox, 318 Ill.App.3d 161, 251 Ill. Dec. 133, 739 N.E.2d 1066 (2000); Bradshaw v. State, 759 N.E.2d 271 (Ind.App. 2001); State v. Bergmann, 633 N.W.2d 328 (Iowa 2001); State v. Barker, 252 Kan. 949, 850 P.2d 885 (1993); State v. Kalie, 699 So.2d 879 (La. 1997); State v. Washington, 687 So.2d 575 (La.App., 1997); Fitzgerald v. State, 384 Md. 484, 864 A.2d 1006 (2004); Commonwealth v. Feyenord, 62 Mass.App. 200, 815 N.E.2d 628 (2004); Millsap v. State, 767 So.2d 286 (Miss.App., 2000); State v. LaFlamme, 869 S.W.2d 183 (Mo.App.1993); Gama v. State, 112 Nev. 833, 920 P.2d 1010 (1996); State v. Van Cleave, 131 N.M. 82, 33 P.3d 633 (2001); People v. Offen, 78 N.Y.2d 1089, 578 N.Y.S.2d 121, 585 N.E.2d 370 (1991); State v. Fisher, 141 N.C.App. 448, 539 S.E.2d 677 (2000); State v. Kesler, 396 N.W.2d 729 (N.D.1986); State v. Rusnak, 120 Ohio App.3d 24, 696 N.E.2d 633 (1997); Scott v. State, 927 P.2d 1066 (Okla.Crim.App.1996); State v. Smith, 327 Or. 366, 963 P.2d 642 (1998); Commonwealth v. Johnston, 515 Pa. 454, 530 A.2d 74 (1987); State v. England, 19 S.W.3d 762 (Tenn.2000); Rodriguez v. State, 106 S.W.3d 224 (Tex.App.2003); State v. Miller, 256 Wis.2d 80, 647 N.W.2d 348 (Wis.App.2002); Morgan v. State, 95 P.3d 802 (Wy.2004).
People v. Jones, 755 N.W.2d at 228 n. 4.
[5] Contrary to Nelson and Cardwell, State v. Ortiz, 257 Neb. 784, 801, 600 N.W.2d 805, 819-20 (1999), relied on by the partial dissent, likens the canine sniff to electronic surveillance equipment.
[6] To our way of thinking, this factual pattern, including the crime stopper tip leading to the officer's presence at defendant's front door meets "option two" of the dissent's "three option" analysis, and the trial court's decision would require reversal on that basis. The officer did not decide to do a random stroll of the neighborhood in search of drugs behind closed doors so there is no need to address such a factual scenario.
[7] While we conclude that existing case law, both Federal and State, support our analysis, we, like the dissent, cannot fault the trial court's reliance on Rabb. See Pardo v. State, 596 So.2d 665, 666-67 (Fla. 1992) (observing that "in the event the only case on point on a district level is from a district other than the one in which the trial court is located, the trial court [is] required to follow that decision").
[8] According to the detective, in a hydroponics lab for growing marijuana, high intensity light bulbs are used which create heat. This causes the air conditioning unit to run continuously without cycling off.
[9] Questions have been raised about the reliability of dog sniffs. Illinois v. Caballes, 543 U.S. 405, 417, 125 S.Ct. 834, 160 L.Ed.2d 842 (Souter, J., dissenting); Lewis R. Katz and Aaron P. Godemboewski, supra, 85 Neb. L.Rev. at 752-65; 1 Wayne R. LaFave, supra, § 2.2(g), at 532-34.

Requiring either a warrant or reasonable suspicion addresses this concern by requiring articulable facts pointing to existence of drug activity within the dwelling. In the event of a positive alert by the dog, the affidavit in support of the search warrant for the search of the home will then include the articulable facts plus the sniff, not just the sniff alone.